UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JUSTIN MEDLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-0080 |
| | ) | Chief Judge Crenshaw |
| | ) | |
| CITY OF ALGOOD, TENNESSEE, | ) | |
| GARY HARRIS, in his official and | ) | |
| individual capacity, SCOTT BILBREY, | ) | |
| in his official and individual capacity, | ) | |
| and KEITH MORRISON, in his official | ) | |
| and individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Justin Medlin filed this lawsuit asserting both federal and state law violations after he was terminated from his position as a City of Algood, Tennessee police officer. Now before the Court is former Mayor Scott Bilbrey's Motion for Judgment on the Pleadings (Doc. No. 30). That Motion has been fully briefed by the parties (Doc. Nos. 31, 36, 38) and, for the reasons that follow, will be granted.

**I. Factual Allegations**

The Complaint contains the following relevant allegations:

Medlin was an Algood police detective when he was constructively discharged in 2017. At the time, Bilbrey was Mayor, Gary Harris was the Police Chief, and Keith Morrison was the City Manager. (Doc. No. 1, Complaint ¶¶ 11, 12).

Algood's City Charter places its governance in the hands of the City Council. The City Council consists of the Mayor, Vice-Mayor and three Council Members. That body has promulgated

handbooks governing city employees, along with employment policies and procedures relating to the hiring, discipline, and termination of city employees. By way of a handbook, employees are provided certain procedural rights, including notice and the opportunity to contest adverse employment decisions. They are also given the right to appeal, first to the City Manager, and then to the City Council as a whole. (Id. ¶¶ 14-16).

In January of 2017, Medlin was placed on administrative leave by Chief Harris pending an investigation into the alleged misuse of a city-issued cell phone. That use allegedly included the exchange of explicit messages, digital images, and/or video recordings. Although Chief Harris told Medlin that a third-party complaint about the misuse of the cell phone had been received, Medlin never saw that complaint. Nor was Medlin ever provided any statement or notice of the express allegations lodged against him, or the actual basis for being placed on leave. (Id. ¶ 17). Nevertheless, Medlin was required to surrender his firearm, and turn over his cell phone. (Id.).

According to Medlin, "it has now come to light" that Chief Harris "was plotting to terminate or force Mr. Medlin to resign from his position from the Algood Police Department as far back as the time period [when] Chief Harris was acting or temporary chief and was under consideration for the permanent position." (Id. ¶¶ 12, 18).[1] Moreover, "recent information received by the general public," shows that Chief Harris believed Medlin "wielded too much influence with the Algood City Council," and that "Medlin was a hindrance to his [Chief Harris's] growing political power within city government." (Id. ¶ 18). This was so, even though Medlin had actually supported then-Assistant Chief Harris's bid to become police chief. Medlin also alleges that Chief Harris "was

---

[1] According to the Complaint, Harris became interim chief in 2013, and was appointed permanent chief in 2014. (Id. ¶ 12).

2

working both sides of the political fence to foment dissention [sic] between Mr. Medlin and Defendant Keith Morrison," and "was also actively attempting to destroy Mr. Medlin's character to erode his perceived influence over the city council." (Id.).

While on administrative leave, Medlin was provided no further information about the investigation into the alleged misuse of the city issued cell phone. Nevertheless, on February 2, 2017, he was told there would be a formal hearing the following day to consider his termination. No advance notice was given as to "what was to be the subject matter of the hearing or the evidence that would be presented." (Id. ¶ 19). In fact, at this point, Medlin had still not received formal notice that he had been placed on administrative leave.

Medlin retained counsel who was "expressly advised" by the City Attorney "that while there could be a brief continuance, the city would seek a hearing very quickly to consider the Plaintiff's fate." (Id. ¶ 22). The following then occurred:

> [O]ne day before the hearing was scheduled, the city attorney delivered documents [to Medlin's] attorney which would to be introduced or utilized in the administrative hearing. Moreover the city attorney advised that he had the authority to sit as the administrative judge in lieu of the city manager to consider the issue of the Plaintiff's employment. It was made expressly clear that it was the opinion of city officials that Mr. Medlin had violated city policy and he should be terminated. It was also made clear that it did not matter who would sit in judgment of Mr. Medlin, and that he would be terminated from his position.
>
> *                         *                         *
>
> [W]ith the knowledge that any administrative hearing would be fruitless, Mr. Medlin had no choice but to resign his position in an attempt to retain some financial benefits. It was not implied, but expressly stated in the meeting leading up to the hearing that the Plaintiff's fate was sealed and he was going to be fired. In addition, there was almost no time to prepare for a hearing in consideration of all the documents that were provided less than 24 hours prior to the hearing. Mr. Medlin submitted his resignation on February 10, 2017.

(Id. ¶¶ 22, 25). Medlin resigned as an Algood police officer on February 10, 2017. (Id. ¶ 25).

3

After Medlin's resignation, "it was revealed that [Chief] Harris made a series of audio and video recordings of his conversations with various city employees and/or officials," including Medlin. (Id. 27). It was also "revealed that [Chief] Harris had sought to defame and destroy Mr. Medlin in an effort to have him either resign or be terminated from the Algood police force." (Id.). Towards that end, Chief Harris "actively recruited other officers and officials to assist him in carrying out his plot, which included pitting the Plaintiff against other city employees and/or officials" because Chief Harris "was very concerned about Mr. Medlin's influence with the city council[.]" (Id.).

Also after Medlin's resignation, Mayor Bilbrey invited members of the local press, the Nashville news stations, and members of the public to a press conference. According to Medlin:

> At this press conference, Defendant Bilbrey announced the "findings" of the city's investigation and publically called out Mr. Medlin. Some of the information disclosed by Mayor Bilbrey was exaggerated, and some of the information contained outright falsehoods. Regardless, Defendant Bilbrey had no reason to hold a public press conference, which was designed solely to demean and attack Mr. Medlin and, ultimately, hinder his chances of future employment. The Plaintiff would submit none of the information gained from the city investigation involved a city matter or matter of public concern. It was merely private communications between him and third parties. At one point, Defendant Bilbrey declared the Plaintiff "quit" before he could be fired by the mayor. The mayor has no authority to terminate employees of the city under the city charter, but that did not stop him from implying he could do so, and would have done so if given the opportunity.

(Id. 28).

As a result of the foregoing, Medlin claims that he has been (1) unable to find employment in the law enforcement field, (2) "irreparably damaged by the Defendants' failures to follow their own policy or to provide a modicum of due process"; (3) "harmed by the very public disclosure of private facts"; and (4) subjected to "public shame, scorn, and humiliation." Id. ¶¶ 29, 31). His federal claims are brought under 42 U.S.C. § 1983, and include the denial of procedural and

4

substantive due process in violation of the First and Fourteenth Amendment, and retaliation in violation of the First Amendment. He also brings state law claims for the false light invasion of privacy, the intentional infliction of emotional distress, and violation of the Tennessee Public Employee Freedom Act, Tenn. Code Ann. § 8-50-602.

## II. Standard of Review

Motions for Judgment on the Pleadings are governed by Rule 12(c) of the Federal Rules of Civil Procedure and are analyzed the same as Motions to Dismiss for failure to state a claim under Rule 12(b)(6). Jackson v. Prof'l Radiology Inc., 864 F.3d 463, 466 (6th Cir. 2017). In ruling on such motions, "a district court must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief.'" Engler v. Arnold, 862 F.3d 571, 574–75 (6th Cir. 2017) (quoting Kottmyer v. Maas, 436 F.3d 684, 689 (6th Cir. 2006)). To survive either a 12(b)(6) or 12(c) motion, the 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Id. at 575 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "Mere labels and conclusions are not enough; the allegations must contain 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id.

## III. Application of Law

The Complaint is 13 pages long, of which 6 pages are devoted to the "Material Allegations." The Court has set forth those allegations in more detail than usual on a motion to dismiss, and quoted extensively from the Complaint because it proves Bilbrey's ultimate assertion: the Complaint lacks sufficient *factual* assertions to hold him liable under any of the federal claims alleged. And

5

because the allegations for the federal claims are insufficient, the Court will decline to exercise supplemental jurisdiction over the state law claims.

## A. *Federal Claims*

### 1. *Procedural Due Process*

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." Women's Med. Prof'l Corp. v. Baird, 438 F.3d 595, 611 (6th Cir. 2006) (citing Hahn v. Star Bank, 190 F.3d 708, 716 (6th Cir. 1999)).

"'Government employment amounts to a protected property interest when the employee is 'entitled' to continued employment,'" and the source of this right may be found in a written policy that allows for dismissal only for "just cause." Nunn v. Lynch, 113 F. App'x 55, 58–59 (6th Cir. 2004) (quoting Bailey v. Floyd Cty. Bd. of Educ., 106 F.3d 135, 141 (6th Cir.1997)). "The 'root requirement' of the Due Process Clause," is "'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest,'" and "'[t]his principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.'" Rodgers v. 36th Dist. Ct., 529 F. App'x 642, 648 (6th Cir. 2013) (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985)).

Medlin does not deny that he was provided with the opportunity for a hearing, but his description of events conjures up images of a "kangaroo court" in the sense that the outcome was

allegedly preordained. See, Rideau v. State of La., 373 U.S. 723, 726 (1963) (stating that "kangaroo court proceedings" can be a "more subtle but no less real deprivation of due process of law"). Not only was Medlin not provided with formal notice, the City Attorney dropped a stack of documents on his attorney the day before the hearing and allegedly told him that Medlin would be fired. What Medlin does not allege, however, is more telling. One can search the Complaint in vane for any *factual* allegations that remotely suggest *Bilbrey* (1) was personally involved in the investigation; (2) placed Medlin on administrative leave; (3) failed to provide notice of the charges; or (4) involved in the administration process in any way prior to the press conference.

Medlin appears to recognize as much because he argues that his "procedural due process claims are essentially bilateral with two distinct cause of action: (1) the inadequate, flawed, and downright biased process under which he was first suspended and ultimately constructively discharged; and (2) the liberty interest of which he was deprived by the stigma inflicted by Defendant Bilbrey's unwarranted post-termination press conference." (Doc. No. 36 at 10). Medlin relies on "stigma-plus" for this theory of liability.

The stigma-plus test is used to analyze a due process claim where the action taken by the state injures one's reputation. Plaintiff must show that "the state's action both damaged his or her reputation (the stigma) and that it deprived him or her of a right under state law." Paul v. Davis, 424 U.S. 693 (1976). Id. Five factors are considered:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment. . . . Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance. . . . Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

7

Brown v. City of Niota, 214 F.3d 718, 722–23 (6th Cir. 2000).

Medlin alleges that Bilbrey "announced the findings" of the investigation, "publically called [him] out," and disclosed "information" that was "exaggerated," or contained "outright falsehoods." What was exaggerated or false, and what "calling one out" constitutes, is not specified. (Doc. No. 1, Complaint ¶ 28). For purposes of the stigma-plus test, it would require omniscience on the part of the reader of the Complaint to conclude that Bilbrey did anything more than allege performance problems, incompetence, neglect of duty, or malfeasance by Medlin. See, Crosby v. Univ. of Kentucky, 863 F.3d 545, 556 (6th Cir. 2017) (stating that second factor requires showing the imposition of a "moral stigma such as immorality or dishonesty" that was capable of "seriously damaging standing and association in community" or foreclosing employment opportunities).

Regardless, "[i]n addition to satisfying each of those five factors, the plaintiff must also allege that he requested and was denied a name-clearing hearing" because "[i]t is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." Id. at 559; see also, Quinn v. Shirey, 293 F.3d 315, 320 (6th Cir. 2002) (stating that "the public employer deprives an employee of his liberty interest without due process, if upon request for a name-clearing hearing, the employee is denied"). Medlin does not allege that he requested and was denied a name clearing hearing by Bilbrey, or by anyone else for that matter. Indeed, the Complaint alleges that the hearing was scheduled to proceed, albeit sooner than Medlin would have preferred, until he decided to resign.

Medlin's procedural due process claim is subject to dismissal.

### *2. Substantive Due Process and First Amendment Retaliation*

Medlin's substantive due process claim, which he links to his First Amendment claim, fares

8

no better. "Substantive due process 'prevents the government from engaging in conduct that shocks the conscience' . . . or interferes with rights implicit in the concept of ordered liberty[.]'" Prater v. City of Burnside, 289 F.3d 417, 431 (6th Cir. 2002) (quoting United States v. Salerno, 481 U.S. 739, 746 (1987)). With regard to the scope of the liberty rights protected, the Sixth Circuit has explained:

> Over time, the Supreme Court has construed the substantive component of the Due Process Clause to protect two types of "liberty." It incorporates most of the guarantees of the Bill of Rights – which originally restricted only the Federal Government, see Barron v. Baltimore, 32 U.S. 243, 247, 7 Pet. 243, 8 L.Ed. 672 (1833) – and protects these rights from state infringement. And it protects other "fundamental rights" not expressly mentioned in the Bill of Rights but "implicit in the concept of ordered liberty," Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and "deeply rooted in this Nation's history and tradition," Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)—including "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education," Lawrence v. Texas, 539 U.S. 558, 574, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003).

Flaskamp v. Dearborn Pub. Sch., 385 F.3d 935, 941 (6th Cir. 2004).

The Supreme Court has held that among the "deeply rooted" liberty rights is the two-fold right to intimate association. "In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty." Roberts v. U.S. Jaycees, 468 U.S. 609, 617–18 (1984). "In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion." Id. at 618. Either way, "[t]he Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." Id.

9

Medlin claims he was denied substantive due process because his right to associate within the meaning of the First Amendment was violated. More specifically, he alleges that he was retaliated against in violation of the First Amendment when he was constructively discharged for communicating (associating) with other Algood employees and City Counsel members. However, a claim based on the substantive due process right to free speech is duplicative of a First Amendment retaliation claim, Handy-Clay v. City of Memphis, 695 F.3d 531, 547 (6th Cir. 2012); Brandenburg v. Hous. Auth., 253 F.3d 891, 900 (6th Cir.2001), and Medlin has not adequately alleged the latter.

A First Amendment retaliation claim has three elements: "'(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.'" Paterek v. Vill. of Armada, 801 F.3d 630, 645 (6th Cir. 2015) (quoting Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 723 (6th Cir. 2010)).

The Complaint never makes clear the "protected conduct" involved, although at one point it alleges that "none of the information gained from the city investigation involved a city matter or matter of public concern [but] was merely private communications from [Medlin] and third parties." (Doc. No. 1, Complaint ¶ 28). At another point, the Complaint speaks about Medlin's "private affairs and the public disclosure of private fact." (Id. ¶ 29). At still another point the Complaint alleges that Medlin had a "substantive due process right to engage in legal social relationships with whomever he chooses." (Id. ¶ 39). These broad and conclusory allegations make it difficult to determine whether Medlin is really complaining about "constitutionally protected" conduct. "While public employees may not be required to sacrifice their First Amendment free speech rights in order

to obtain or continue their employment, a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." Scarbrough v. Morgan Cty. Bd. of Educ., 470 F.3d 250, 255 (6th Cir. 2006). The exchanging of illicit messages and photographs via a city-issued cell phone is likely not constitutionally protected, but this is one way the Complaint can be read. In any event, the Sixth Circuit "has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right." Lanman v. Hinson, 529 F.3d 673, 684 (6th Cir. 2008) (italics in original) (citing Terrance v. Northville Reg'l Psychiatric Hosp., 286 F.3d 834, 842 (6th Cir. 2002)). This requires the court to "analyze separately whether [plaintiff] has stated a plausible constitutional violation by each individual defendant, and [the plaintiff] cannot ascribe the acts of all individual defendants to each individual defendant." Heyne v. Metro. Nashville Pub. Sch., 655 F.3d 556, 564 (6th Cir. 2011).

Focusing on Bilbrey, his alleged actual involvement occurred after the allegations of misconduct had been made by Chief Harris, the "investigation" had been completed, and Medlin had resigned. Medlin does not explain how, given this time-line of events, Bilbrey was personally involved in depriving Medlin of his First Amendment rights, or how Bilbrey retaliated against him for engaging in such protected activity when, in fact, Medlin had resigned by the time of Bilbrey's press conference.

Medlin's substantive due process and First Amendment retaliation claims will also be dismissed.

### 3. *Conspiracy Claim*

In his reply brief, Medlin tacitly concedes the lack of factual allegations regarding Bilbrey's

11

involvement before the press conference. Medlin writes:

> It is true the vast majority of the specific allegations involve Defendants Harris and Morrison, as Harris was the chief of police and Morrison the city manager, who would have been Mr. Medlin's immediate supervisors. However, there are very specific allegations leveled against Mr. Bilbrey which taken as true, with all inferences drawn in favor of Mr. Medlin, would sustain the causes of action as set forth in the complaint. The entire complaint read as a whole alleges a rather intricate conspiracy executed primarily by Defendants Morrison and Harris, but participated in by Scott Biblrey, specifically in his post-termination conduct.
>
> In particular, Mr. Medlin alleged that following his resignation, that Mr. Biblrey held a press conference that was part of an ongoing conspiracy to not only terminate him, but to also stigmatize and tarnish the Plaintiff's reputation.
>
>    \*      \*      \*
>
> Mr. Medlin would note that Mr. Biblrey publically implied he had the authority to terminate him, and would have done so if given the opportunity. Thus, implicating himself in this plan and conspiracy to terminate the Plaintiff and ruin his reputation.

(Doc. No. 36 at 2-3 (footnote omitted)).

Despite alleging an "intricate conspiracy," there are insufficient facts pled to hold Bilbrey liable. Apart from paragraph 28 of the Complaint regarding the alleged statements made at the press conference, the only allegations regarding Bilbrey's involvement in anything, including an alleged conspiracy, are the following:

> The investigation into the Plaintiff's private affairs and the public disclosure of private facts were part of an ongoing plan by Defendant Harris and Defendant Bilbrey to destroy the Plaintiff and have him removed from the Algood police force one way or another, [and] Mr. Bilbrey did not even have the authority to terminate the Plaintiff in the first place.
>
> Defendants Bilbrey and Morrison afforded the Plaintiff insufficient due process. He was never given specific or express notice of the complaints or charges against him, he was given insufficient time to mount a proper defense, even if the charges were properly outlined and he was provided evidence, and it was expressly stated that he would be terminated following the hearing, which was never going to be fair or neutral.

> The Plaintiff would submit the conduct of Defendants Harris, Bilbrey, and Morrison, constituted a city policy, custom, and/or practice as the chief city officials.
>
> [T]he deprivation of his constitutionally protected right [to procedural due process] was individually perpetrated by Defendants Morrison and Bilbrey, who also conspired with Defendant Harris.
>
> The right to free speech and association are bedrock principles of the First Amendment. Defendants Morrison and Bilbrey, conspiring with Defendant Harris, deprived him of his guaranteed First Amendment rights by virtue of their retaliation. The Plaintiff would submit his termination was retaliation for her [sic] association with members of the city council, and for speaking to city council members.
>
> Defendants Bilbrey and Morrison, both in their official and individual capacities, deprived the Plaintiff of his constitutional rights as guaranteed by the United States constitution. Moreover, by virtue of their authority and ratification by the whole city council, the actions and conduct of Morrison and Bilbrey constitutes an official city policy, act, procedure and/or custom. As such, the Defendants are liable to the Plaintiff pursuant to 42 U.S.C. § 1983.

(Doc. No. 1, Complaint ¶¶ 29, 31, 36-38, 40-42).

For the most part, these allegations are nothing more than legal conclusions masquerading as facts, that, as a matter of law, are insufficient to survive dismissal. See, D'Ambrosio v. Marino, 747 F.3d 378, 383 (6th Cir. 2014) (stating that, on a motion for judgment on the pleadings or to dismiss for failure to state a claim, a court "need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice."). Instead, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" Republic Bank & Trust Co. v. Bear Stearns & Co., Inc., 683 F.3d 239, 246–47 (6th Cir.2012).

Furthermore, "[i]t is 'well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be

sufficient to state such a claim under § 1983.'" Fieger v. Cox, 524 F.3d 770, 776 (6th Cir. 2008) (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1538 (6th Cir.1987)). "Accordingly, pleading requirements governing civil conspiracies are relatively strict." Id.

Though no separate conspiracy count is alleged, the factual allegations in Medlin's Complaint that presumably underlie his Section 1983 conspiracy claim are no more specific than his allegations made in support of his other claims that have already been deemed insufficient. Indeed, when the facts and inferences involving Bilbrey are construed in Medlin's favor, the most they show is that Bilbrey was the Mayor and part of the City Council, at some unspecified point in time the City Council developed a written handbook that allowed dismissal from employment for just cause only, Medlin was improperly investigated and accused of misconduct such that he felt compelled to resign, and, after the resignation, Bilbrey held a press conference during which he "exaggerated facts" and "demeaned" Medlin. Taken collectively, these allegations do not suggest that Bilbrey deprived Medlin of substantive or procedural due process rights, or deprived Medlin of his First Amendment right to association. Nor do the factual allegations – as opposed to legal conclusions – suggest "that there was a single plan" in which Bilbrey shared a "general conspiratorial objective" with others "to injure [Medlin] by unlawful action," Bickerstaff v. Lucarelli, 830 F.3d 388, 400–01 (6th Cir. 2016), all of which are essential to state a conspiracy claim under 42 U.S.C. § 1983.

To the extent that Medlin is asserting a conspiracy claim against Bilbrey, that, too, must be dismissed.

**B. State Law Claims**

With the dismissal of Medlin's federal claims against Bilbrey, the Court will not retain

jurisdiction over the state law claims against that Defendant because, pursuant to 28 U.S.C. § 1367(c)(3), there is a "strong presumption in favor of declining to exercise jurisdiction over supplemental state-law claims after dismissing federal anchor claims[.]" Martinez v. City of Cleveland, 700 F. App'x 521, 523 (6th Cir. 2017). This holds true even where, as here, federal claims remain against other defendants. See, e.g., Ryan v. Illinois Dep't of Children & Family Servs., 185 F.3d 751, 764-65 (7th Cir. 1999); Oilfield Services, LLC v. Pecha, 2013 WL 3458163 (W.D. Pa. July 9, 2013); Timeline, Inc. v. Proclarity Corp., No. C05-1013JLR, 2007 WL 1574069, at *10 (W.D. Wash. May 29, 2007); Spearman v. Tom Wood Pontiac-GMC, Inc., 2001 WL 1712506 at * 7 (S.D. Ind. Dec. 3, 2001). Retention of state law claims, however, may be appropriate where the case has been pending for a long time, discovery has been completed, the record is voluminous, a court has spent significant time on the litigation, and there are pending motions for summary judgment. Harper v. AutoAlliance Int'l, Inc., 392 F.3d 195, 211 (6th Cir. 2004).

This case is neither old nor voluminous as it was filed barely a year ago and there have only been 42 docket entries thus far. Further, discovery is ongoing, and the deadline for dispositive motions has yet to pass. Indeed, the only real substantive involvement in this case by the Court so far has been to rule on the present Motion for Judgment on the Pleadings. In light of these factors, retaining jurisdiction over the supplemental state law claims against Bilbrey is unwarranted.

### III. Conclusion

For the foregoing reasons, Bilbrey's Motion for Judgment on the Pleadings (Doc. No. 30) will be granted. Medlin's federal claims will be dismissed, and the Court will decline to exercise jurisdiction over his state law claims against Bilbrey.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE