| | | |
|---|---|---|
| **VAUGHN LARSON,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **NO. 2:17-cv-00079** |
| | ) | |
| **CITY OF ALGOOD, TENNESSEE,** | ) | |
| **GARY HARRIS, SCOTT BILBREY** | ) | |
| **and KEITH MORRISON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| **JUSTIN MEDLIN,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **NO. 2:17-cv-00080** |
| | ) | |
| **CITY OF ALGOOD, TENNESSEE,** | ) | |
| **GARY HARRIS, and KEITH** | ) | |
| **MORRISON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| **KAREN BOHANNON,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **NO. 2:18-cv-00022** |
| | ) | |
| **CITY OF ALGOOD, TENNESSEE,** | ) | |
| **SCOTT BILBREY and** | ) | |
| **KEITH MORRISON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

In these three consolidated actions,[1] Defendants have filed a Motion for Summary Judgment on all of Plaintiffs' claims. (Case Nos. 2:17-cv-00079, Doc. No. 40; 2:17-cv-00080, Doc. No. 50; 2:18-cv-00022, Doc. No. 35). Those Motions have been fully briefed by the parties and, for the reasons that follow, will be granted with respect to Plaintiffs' federal claims, but the Court will decline to exercise supplemental jurisdiction over their state law claims.

## I. Background

Just looking at Plaintiffs' counter-statement of facts, one might guess that this is a complicated class action, or a multi-district litigation (MDL) case. It is not. It is a case about three former employees of the City of Algood ("Algood" or "City"), Tennessee who claim they were unlawfully discharged. Nevertheless, and for reasons that could probably never be adequately explained, Plaintiffs have filed a 78-page, 438-paragraph Statement of Undisputed Facts (Doc. No. 79).

This Court's Local Rules provide that, in response to a motion for summary judgment and its accompanying statement of facts, "the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried." L.R. 56.01(c). Despite Plaintiffs' claims to the contrary,[2] the facts they present are not concise, some are not additional, and many are simply not

---

[1] Although virtually the same filings have been made in each case, Medlin v. City of Algood *et al.*, No. 2:17-cv-00080 has been designated as the lead case. Therefore, the Court will cite to that docket sheet when referring to the underlying record.

[2] Plaintiffs acknowledge that the statement is "extremely long," but claim it is "concise" because "it attempts to encapsulate three separate cases" and "involves multiple federal and state law claims[.]" (Doc. No. 79 at 1, n.1).

material.

The first 12 pages and 66 paragraphs of Plaintiffs' statement consist of what can only be characterized as a lengthy summary of Justin Medlin's deposition testimony. This is followed by a 12-page, 71-paragraph summary of Vaughn Larson's deposition testimony, and then a 4½-page, 40-paragraph summary of Karen Bohannon's deposition testimony. Next, the statement turns its attention to the individual Defendants' deposition testimony with 9 pages and 56 paragraphs devoted to Gary Harris, and then a 12 ½-page 62-paragraph summary of Scott Bilbrey's testimony. This is followed by 72 pages consisting of 108 paragraphs that primarily summarize Keith Morrison's deposition testimony, but also includes excerpts from Algood's handbook, and the entirety of a letter from Plaintiffs' counsel that Morrison received from the City Attorney. The remaining 5 pages and 18 paragraphs are devoted to recounting a press conference where Plaintiffs' terminations[3] were announced, including setting forth verbatim a news story published February 24, 2017.

As can be expected when "factual" statements are based almost exclusively upon deposition testimony, many of the statements are nothing more than opinions, beliefs and speculations. Other statements contain interpretations of law, masquerading as facts. None of this is proper, nor helpful.

No doubt, somewhere within Plaintiffs' colossal filing are actual, disputed facts that support their respective positions, but it is not the Court's duty to sift through that filing to determine what those may be. See, Emerson v. Novartis Pharm. Corp., 446 F. App'x 733, 736 (6th Cir. 2011) (noting that while "there might have been evidence in the record . . . to create a material question of fact . . . it was not the district court's duty to track down those facts"); Finley v. Kelly, ___ F.

_____

[3]  For simplicity, the Court refers to all three Plaintiffs as having been terminated from their employment, even though Medlin resigned. He claims to have been constructively discharged, which is an issue that the Court need not decide because, even if true, he has failed to establish a viable federal claim.

Supp.3d ___, ___, No. 3:19-CV-00129, 2019 WL 2482159, at *7 (M.D. Tenn. June 14, 2019) (internal citation omitted) (explaining that, in considering the record, a court is "not like a boar 'hunting for truffles,' . . . or a gold prospector looking for nuggets"). Instead, in determining whether genuine disputed material facts exist, the Court needs to know the time, not how to build a clock, and certainly not one the size of Big Ben.

Nevertheless, the Court has reviewed all of the filings including Plaintiffs' Statement of Facts ("PSOF") and Defendants' responses thereto (Doc, No. 83) and Defendants' Statement of Facts ("DSOF") and Plaintiffs' responses thereto (Doc. No. 77). From those filings and based on the record as a whole, the following appear to be the relevant facts:

Medlin, Larson, and Bohannon all worked for the City of Algood. Medlin was a police officer and most recently a Detective Sergeant. Larson had dual roles, working as both the City Recorder and City Clerk. Bohannon worked for the Public Works Department as a water meter reader. (PSOF ¶¶ 47, 145, 319).

Defendants, too, worked for the City. Gary Harris was a police officer who eventually became Chief of Police; Scott Bilbrey was the Mayor, and Keith Morrison was the City Manager. (Id. ¶¶ 33, 35, 236).

In all, the City has approximately 30 employees, of whom a dozen or so work on the police force. (Doc. No. 78-1 Medlin Depo. at 115). There are no contracts of employment, and the City Handbook explicitly states that it does not create any contractual rights. (DSOF ¶ 5).

During his employment with the City, Medlin spoke with Bohannon in person and via cell phone. Some of those conversations occurred while they were on duty. He also texted both Bohannon and Larson and sent sexually explicit images of his anatomy to both women, including

4

pictures of his penis. (PSOF ¶ 11). Medlin also used his cell phone to receive and store sexually explicit picture and messages that he received from Larson and Bohannon. (DSOF ¶¶ 3, 4).

The parties dispute who owned the cell phone, with Defendants claiming it belonged to the City. Medlin asserts the cell phone was given to him by Harris after Harris purchased it from the City, and it was Medlin's belief that he could do with it as he pleased. (PSOF ¶ 12). Regardless, it is undisputed that the City paid for the cellular service that Medlin used. (Id. ¶¶ 15, 16).

Medlin's relationship with Bohannon and Larson extended beyond these sexually-charged conversations and electronic communications. He had a sexual relationship with both women. (Id. ¶¶ 10, 7). The sexual activity with Larson occurred off-duty. (Id. ¶ 88). With Bohannon, the location and time of such activity was not so limited and discrete, as they had sexual relations several time at work while both were on duty and, at least one time, at City Hall. (PSOF ¶ 10). In addition to those two women, Medlin sent sexually explicit texts and photos to at least four other women while he was on duty as an Algood police officer. (Doc. No. 55-1, Medlin Depo. at 22-24).

At some point, Harris received a complaint from his cousin, Tammy Sheldon, regarding a sexually explicit picture Medlin had sent her via Facebook. (PSOF ¶ 204). On January 11, 2017, Medlin was summoned to a meeting with Harris, during which Harris told him that he had received a complaint and showed Medlin the picture. Harris also said that he had spoken with Morrison who instructed Harris to send Medlin home. (Doc. No. 78-1, Medlin Depo. at 72). At that time, Medlin was placed on paid leave pending an investigation.

As the investigation unfolded, Medlin hired a lawyer and requested a hearing. The City agreed to that request and scheduled a pre-termination hearing. (DSOF ¶ 9). However, on February 10, 2017, immediately before the hearing, Medlin submitted a resignation letter addressed to the City

Attorney, and the hearing was cancelled. (PSOF ¶ 3).

Medlin claims he resigned because he "felt like he had to . . . get the benefits he would otherwise not be entitled to if he had been terminated," including pay for accrued leave time. (PSOF ¶ 23). Medlin also believed that any hearing would be a mere formality because he would be fired no matter what he said. (Id. ¶ 24). This belief apparently stemmed from the fact that, while Medlin had supported Harris' bid to become police chief, the two had since had a falling-out. In fact, Harris vowed to "get rid" of Medlin because Medlin was too close to City Council, and Harris believed that Medlin was responsible for an investigation into the alleged fixing of traffic tickets by Harris. (Id. ¶ 25).

After Medlin's resignation, Bilbrey confronted Larson and Bohannon separately on February 21, 2017. Bilbrey met with Larson in her office and told her that "sexting messages" involving Medlin were going to be released to the public, the City had copies of those messages, and that anybody involved in the situation would be terminated. Larson asked to be presented with proof supporting the allegations, and Bilbrey gave her printed copies of the messages that she and Medlin had exchanged. At the conclusion of the meeting, Bilbrey told Larson that she was terminated. The City Council ratified Larson's termination on March 14, 2017. (PSOF ¶¶ 101, 102; DSOF ¶¶ 20-23)

A similar scenario played out in relation to Bohannon. Bilbrey met with her in her office at City Hall, informed her that Medlin had exchanged and stored inappropriate sexually explicit messages on his phone, told her that she was one of the individuals involved, and handed her printed copies of the messages that she had exchanged with Medlin. Bilbrey told Bohannon that she was terminated and that she should collect her things and leave. Bohannon complied. (PSOF 162-171; DSOF ¶¶ 13-14).

On February 24, 2017, Bilbrey held a press conference and announced the investigation and its results.[4] This was a first for Bilbrey, as he had never before held a press conference in relation to the termination of an Algood employee. (PSOF ¶ 54).

During the press conference, Bilbrey stated that he would have fired Medlin had he not resigned and, while he did not mention either Larson or Bohannon, he stated that the City Clerk and a meter reader were fired. According to Plaintiffs, Bilbrey also made several false statements during the press conference, among them that (1) Medlin was colluding with city council members to oust Harris and appoint another person as chief; (2) certain police officers had been improperly fraternizing with council members; (3) Medlin had been involved with 10,000 women; (4) Medlin had affairs with married women; and (5) thousands of images were exchanged during the course of the "sexting" scandal.[5] (PSOF ¶ 53, 55-57; Doc. No. 80 at 16). The press conference was covered by the local media, including News Talk 94.1, which published an internet story about the press conference the next day. In it, the article quoted Bilbrey as saying Medlin had sexual relationships with multiple women, including two city employees and a city council woman, the investigation involved the use of a "city-owned cell phone;" that Harris had been the target of some sort of conspiracy involving city council members, and that Bilbrey believed "there was wrongdoing done

---

[4] Prior to the press conference, Bilbrey was interviewed by the Cookeville *Herald Citizen,* a newspaper, during which he previewed what was to be addressed at the upcoming conference, and invited the public to attend. Bilbrey also sent an email to City employees announcing the press conference, stating that he was going to make the Algood's "sexting scandal" public, asserting that the conduct of the individuals involved was "immoral and unethical," and claiming that "city owned devices" were used "that citizens bear the burden of expense for." (PSOF ¶¶ 420-422, 434-437).

[5] As support for what occurred at the press conference, Plaintiffs rely primarily on their own deposition testimony, even though none of them attended it. For example, Medlin stated in his deposition that he was relying on "whatever is on the Internet" as the foundation for his claim that Bilbrey said something about 10,000 women. (Doc. No. 78-1, Medlin Depo. at 117). Nevertheless, Defendants concede the statements Bilbrey is alleged to have made for purposes of the summary judgment motions.

and a deliberate misuse of city devices." (PSOF ¶¶ 423-427).

Neither Larson nor Bohannon requested a hearing in relation to their termination. Nor did any of the Plaintiffs file a grievance. (DSOF ¶¶ 14-21). Instead, they filed separate lawsuits alleging primarily the same federal and state law claims. All allege that they were denied procedural and substantive due process in accordance the Fourteenth Amendment to the United States Constitution.[6] They also allege violations of their First Amendment right to free speech and association. They also bring state law claims for false light invasion of privacy, and the intentional infliction of emotional distress. Finally, Medlin brings an additional claim for constructive discharge in violation of the Public Employee Political Freedom Act of 1980, Tenn. Code. Ann. § 8-50-601, *et seq.*

## II.  Summary Judgment Standards

In considering the present Motions for Summary Judgment, the Court does "not act  as [a] super personnel department," Lee v. City of Columbus,  636 F.3d 245, 258 (6th Cir. 2011), and second-guess the wisdom of the City Fathers' (and Mothers') decisions regarding employees who may have thought they were working in quite the little Peyton Place. Rather, in reviewing a motion for summary judgment, this Court only considers the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c), when the inferences to be drawn from the facts are construed in favor of the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"The party bringing the summary judgment motion has the initial burden of informing the

---

[6]  They also allege denial of due process under the Fifth Amendment, but that Amendment only applies to actions by the federal government. Pub. Utilities Comm'n of D.C. v. Pollak, 343 U.S. 451, 461 (1952); Corrigan v. Buckley, 271 U.S. 323, 330 (1926).

Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). If the movant satisfies this burden, the nonmoving party has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson, 477 U.S. at 479-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247-49).

### III.  Legal Analysis

**A.  Federal Claims**

    **1.  *Procedural Due Process***

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "To state their procedural due process claim, Plaintiffs must establish three elements: (1) that they have a property interest protected by the Due Process Clause; (2) that they were deprived of this property interest; and (3) that the state did not afford them adequate pre-deprivation procedural rights." Cahoo v. SAS Analytics Inc., 912 F.3d 887, 900 (6th Cir. 2019); accord Albrecht v. Treon, 617 F.3d 890, 894 (6th Cir. 2010).

"Property interests are not created by the Constitution," but, instead, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source

such as state law[.]"  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985); (quoting Bd. of Regents v. Roth, 408 U.S., at 564 577 (1972)).  "The law in Tennessee operates under a broad presumption that employees are at will and, by default, lack a property right in their continued employment."  Freeze v. City of Decherd, 753 F.3d 661, 665 (6th Cir. 2014) (citing England v. Andrews, No. 2:05–0008, 2005 WL 2209542, at *7 (M.D. Tenn. Sept. 8, 2005).  Indeed, "[t]he employment at-will doctrine has been a part of Tennessee's common-law legal tapestry for more than a century," and "recognizes the concomitant right of either party to terminate such a relationship with or without cause" at any time.  Forrester v. Stockstill, 869 S.W.2d 328, 330 (Tenn. 1994) (accord Woods v. Metro. Dev. & Hous. Auth. Bd. of Comm'rs, 345 S.W.3d 903, 909 (Tenn. Ct. App. 2011).  Consequently, an employee in Tennessee  "cannot claim an interest in continued employment unless they first prove that a contract governed the terms of employment."  Freeze, 753 F.3d at 665.

Here it is undisputed that none of the Plaintiffs had a contract with Algood.  To get around the settled law in Tennessee, Plaintiffs point to certain provision in the handbook in an effort to cobble up an implied contract of employment.

It is true that "[a] property interest can be created by a . . . contract implied from the circumstances."  Blazy v. Jefferson Cty. Reg'l Planning Comm'n, 438 Fed. Appx. 408, 412 (6th Cir. 2011).  However, "[u]nder Tennessee contract law, a contractual interest in continued employment will not be inferred on behalf of an at-will employee from an employer's conduct absent a 'show[ing] that the agreement . . . was supported by adequate consideration [other than the employee's past services], that there was a mutual assent to the terms of the agreement and that it was sufficiently definite to be enforceable."  Aldridge v. City of Memphis, 404 F. App'x 29, 36 (6th

Cir. 2010) (brackets in original) (quoting <u>Price v. Mercury Supply Co., Inc.</u>, 682 S.W.2d 924, 933 (Tenn. Ct. App. 1984)). That said, "the Tennessee Court of Appeals [has] held that an employee handbook could modify an at-will employment agreement to require the employer to dismiss the employee only for just cause," but this holding is limited to "to those cases where the handbook contains 'unequivocal language demonstrating [the employer's] intent to be bound by the handbook's provisions.'" <u>Brown v. City of Niota</u>, 214 F.3d 718, 721 (6th Cir. 2000) (quoting <u>Reed v. Alamo Rent–A–Car Inc.</u>, 4 S.W.3d 677, 688 (Tenn. Ct. App. 1999)). There is "a high standard for establishing the existence of an employer's specific intent to be bound by the terms of an employee handbook," <u>id.</u>, and this can only "be interpreted in the context of the entire handbook, and read in conjunction with any other relevant material, such as an employment application," <u>Rose v. Tipton Cty. Pub. Works Dep't</u>, 953 S.W.2d 690, 692 (Tenn. Ct. App. 1997)). Plaintiffs cannot meet that standard.

Plaintiffs point to provisions in the handbook that describe the process for suspension, dismissal and other forms of punishment, and then quote the following language relating to discipline:

> When other forms of discipline have not resulted in the desired behavior, or when more severe initial action is warranted, the department head, or the City Administrator, may dismiss an employee.
>
> The employee shall be furnished in advance written notice containing the nature of the proposed action, the reasons therefore, and the right to appeal the charges in accordance with the appeal process established herein. If the employee fails to respond to the advance notice, the proposed action shall be effective on the date specified with no need for further action. If an appeal hearing is requested, the effective date of the dismissal shall be extended until the end of the appeal process. During the extended time, the employee may be retained on duty status, placed on leave, or suspended with or without pay at the discretion of the City Administrator.

(Doc. No. 78-4, Morrison Depo. Exh. 2 at 59). Plaintiffs insist that the language "any city employee

shall have the right to a pre-termination appeal hearing before the City Administrator" is "unambiguous in conveying a right" (Doc. No. 80 at 12).

A similar argument was considered and rejected by the Sixth Circuit in <u>Beech v. Fuller</u>, 172 F. App'x 111 (6th Cir. 2006) in a case involving a City of Lewisburg, Tennessee employee who argued that he had a property interest in a pre-deprivation hearing based on "the provision in the policy manual providing, mandatorily, that 'employees discharged for cause *will* be given notice of a hearing.'" <u>Id.</u> at 113. Noting that there is "no clearer way for an employer to express its intent to be bound by a handbook's provisions than the employer's specific statement that the document represents the parties['] 'entire agreement of employment' and that the employer 'promises and agrees to abide by all its terms and conditions," the Sixth Circuit rejected that argument "given the overall tenor of the document and its failure to make explicit any intent on the part of the employer to be bound by all of its terms and conditions." <u>Id.</u> (quoting <u>Reed</u>, 4 S.W.3d at 688).

The overall tenor of the handbook in this case does not suggest an intent by the City to be bound by all of its terms and conditions. Quite the contrary, the manual contains the following provision:

> These personnel regulations are for information only. <u>This is not an employment contract</u>. This document is a statement of current policies, practices, and procedures." These personnel policies, rules and regulations shall be reviewed periodically. The City reserves the right to change any or all such policies, practices and procedures in whole or in part at any time, with or without notice to employees.

Doc. No. 53-1 Medlin Dep. Ex. 5) (emphasis added). The clear statement that the handbook is not a contract, and the explicit reservation of right to change policies unilaterally indicate that the City did not intend to be bound by each and every specific term. In fact, "'[w]here an employee handbook specifically provides that it is not a contract and reserves to the employer the unilateral right to

amend the handbook's provisions, such handbook does not, as a matter of law, constitute part of the employment contract between the employer and the employee.'" Keller v. City of Cleveland, No. 1:13-CV-91, 2014 WL 2809662, at *6 (E.D. Tenn. June 20, 2014) (citation omitted) (collecting cases).

Such was the holding in Durham v. City of Algood, *et al.*, Case No. 2:0-0045 (M.D. Tenn. June 27, 2003) (Doc. No. 57-1), another case involving the City of Algood employee handbook. There, a terminated employee argued that he had an interest in continued employment and was deprived of the same without the required due process hearing. In rejecting the argument, Judge Haynes, in an opinion affirmed by the Sixth Circuit (Durham v. City of Algood, 114 F. App'x 741 (6th Cir. 2004)) noted that, even though the employee handbook provided that "a suspended employee will be granted a hearing before the mayor upon request," there was no property or liberty interest for purposes of the due process clause because (1) the front page of the manual clearly disclaimed any contractual right; (2) it provided notice that the employment was terminable by either party for any reason; and (3) the employee knew that he had no contract of employment and was terminable at will. (Doc. No. 57-1 at 19).

Even assuming that the handbook constituted an employment contract, "plaintiffs still cannot establish that they had a property interest in continued employment because this contract does not provide a definite term of employment." Niota, 214 F.3d at 720. Tennessee courts have held that '[t]he law is well established in this state that a contract for employment for an indefinite term is a contract at will and can be terminated by either party at any time without cause.'" Id. (quoting

<u>Bringle v. Methodist Hosp.</u>, 701 S.W.2d 622, 625 (Tenn. Ct. App. 1985).[7] And, because "the plaintiffs have pointed to no rule or regulation that defines the duration of the contractual relationship between the city and its employees, they have not rebutted the presumption that they were employees at will." <u>Id.</u>; accord <u>Keller v. City of Cleveland</u>, No. 1:13-CV-91, 2014 WL 2809662, at *6; <u>Davis v. Marshall Cty. Ambulance Servs.</u>, 913 F. Supp. 2d 545, 553 (M.D. Tenn. 2012).

The employee handbook aside, Larson argues, as a city official, "her expectations are more viable due to the city charter provisions which protect her position with a more formal termination process." (Doc. No. 80 at 13). The charter provides, in part:

> Section 2.17. Mayor, City Council, and Other Officials May Be Removed from Office by Council. Be it further enacted, that the mayor or any council member or any city official may be removed from office by the city council for the conviction of any crime in office or for grave misconduct showing unfitness for public service, or for permanent disability, by a majority vote of the other members of the city council voting for such removal. The proceedings for such removal shall be upon specific charges in writing, which, with a notice stating the time and place of the hearing, shall be served upon the accused, or published for three (3) consecutive weeks in a newspaper published or circulated in Algood. The hearing shall be public and the accused shall have the right to appear and defend in person or by counsel and have process of the city council to compel the attendance of witnesses on his behalf.

(Doc. No. 80 at 13. Unfortunately for Larson, the Tennessee Court of Appeals has reached the opposite conclusion when considering a substantially similar city charter.

In <u>Ogburn v. Gas & Water Department</u>, No. 01A01-9702-CH-00056, 1997 WL 528812 (Tenn. Ct. App. Aug. 27, 1997), the court reversed a jury verdict in favor of plaintiff insofar as it

---

[7] The Court recognizes that the Sixth Circuit has since suggested that <u>Brown</u>'s "discussion of the term-of-years presumption came in dicta," and has "read Tennessee law to employ a term-of-years presumption, not a hard-and-fast rule." <u>Freeze v. City of Decherd</u>, 753 F.3d 661, 668 (6th Cir. 2014). However, because the Court finds that Plaintiffs "had no property interest in continued employment," for other reasons, "it need not consider whether <u>Freeze</u> should affect the analysis in this case." <u>Keller</u>, 2014 WL 2809662, at *7 n.3.

was based upon the alleged deprivation of his right to procedural due process prior to his termination as a meter reader. At issue was a portion of the Clarksville, Tennessee city charter that read:

> The mayor or any alderman or any city official or employee may be removed from office by the City Council for any crime, misconduct, unfitness or disability by vote of the City Council. The proceedings for such removal shall be upon specific charges in writing, which, with a notice stating the time and place of the hearing, shall be served upon the person so charged or left at his or her usual place of residence. The hearing may be public and the accused shall have the right to appear and defend...."

Id. at 3. After noting that "[e]xisting rules or understanding as to continued employment . . . evidenced by written policies . . . may give rise to a protected right in that employment, which cannot be taken away without due process," the court found the city charter provided no such right.

Id. In so ruling, the Tennessee Court of Appeals observed:

> The Clarksville City Charter states that the City Council "may" discharge an employee for cause by following a certain procedure. It does not state that this is the only method that the city may use to discharge a city employee, or that the causes mentioned in the charter provision are the only legitimate reasons for which an employee may be terminated. We are thus persuaded that the city's failure to grant Mr. Ogburn a hearing did not rise to the level of a constitutional violation. We accordingly find that the trial court erred in failing to grant the city a directed verdict on Mr. Ogburn's 42 U.S. § 1983 claim, and we reverse the jury verdict as to that claim.

Id. at 5.

Larson insists Ogburn was wrongly decided and, in any event, claims the opinion is of dubious precedential value because it is unpublished. Apart from failing to convince the Court that Ogburn is wrong, the Sixth Circuit has clearly stated that "if the state supreme court has yet to resolve an issue, we follow state appellate court decisions, whether reported or not." City of Cincinnati v. Deutsche Bank National Trust Company, 863 F.3d 474, 478 (6th Cir. 2017); see also, Ziegler v. IBP Hog Mkt., Inc., 249 F.3d 509, 517 (6th Cir. 2001) (observing that "[w]here a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the

state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise" and that "[t]his rule applies regardless of whether the appellate court decision is published or unpublished").

Larson also argues that Ogburn is distinguishable because that case involved a regular employee, while she, in contrast, was a city official. For purposes of the opinion in Ogburn, however, that is a distinction without a difference. Ogburn did not address the due process claim based upon position; it addressed the claim based on the language of the charter that an employee "may be removed from office" for certain conduct who "shall" receive notice of the specific charges, and be provided "the time and place of the hearing." This exact same language appears in the Algood charter.

To the extent Plaintiffs argue their liberty (as opposed to property) interests were violated because they were not provided with a post-termination, name-clearing hearing after Bilbrey made the allegedly defamatory remarks at the press conference, that claim, too, fails. "[A] person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause," and, therefore, "[a]ny deprivation of those interests . . . must be accompanied by notice and an opportunity to be heard to refute any charges against that person." Chilingirian v. Boris, 882 F.2d 200, 205 (6th Cir. 1989) (citing Board of Regents v. Roth, 408 U.S. 564, 573 (1972)). Nevertheless, and as the Sixth Circuit has made clear, "[i]t is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." Quinn v. Shirey, 293 F.3d 315, 320 (6th Cir. 2002) Brown, 214 F.3d at 723. As a consequence, a plaintiff must show that he or she requested a name-clearing hearing and the same was denied. Id.; see also, Helm v. Eells, 642 Fed. Appx 558, 566 (6th Cir. 2016) (finding professor's liberty interest claim

was not viable where, among other things, "he failed to request a name-clearing hearing"); Machisa v. Columbus City Bd. of Educ., 563 Fed. Appx 458, 463 (6th Cir. 2014) ("Before asserting a liberty-interest claim, a plaintiff must show that he or she "requested a name-clearing hearing and was denied that hearing."); Frost v. Univ. of Louisville, No. 3:19-CV-227-CRS, 2019 WL 2288453, at *11 (W.D. Ky. May 29, 2019); ("[T]he Sixth Circuit has made clear that, because it is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process, a plaintiff must request a name-clearing hearing prior to bringing suit."); Wheeler v. Stafford, No. 2:11-CV-00057, 2013 WL 75050, at *4 (M.D. Tenn. Jan. 4, 2013) (noting that, pursuant to Quinn, "a plaintiff must request a 'nameclearing' hearing from her employer" and "[t]his request must be made after the plaintiff has been demoted or fired").  None of the Plaintiffs can make that showing because none ever requested a hearing to contest Bribley's statements.

## 2. *Substantive Due Process*

Whereas procedural due process in concerned with the deprivation of constitutionally protected interests, "[t]he interests protected by substantive due process are of course much narrower, Bell v. Ohio State Univ., 351 F.3d 240, 250 (6th Cir. 2003), and 'serve as a vehicle to limit various aspects of potentially oppressive government action,'" Handy-Clay v. City of Memphis, 695 F.3d 531, 546–47 (6th Cir. 2012) (citation omitted).  Put differently, substantive due process confirms "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." Pearson v. City of Grand Blanc, 61 F.2d 1211, 1216 (6th Cir.1992) (internal quotation marks omitted). "Interests protected by substantive due process, which the legislature may not infringe unless supported by sufficiently important state interests, include those protected by specific constitutional guarantees,

such as the Equal Protection Clause, freedom from government actions that 'shock the conscience,' . . and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental." Bell, 351 F.3d at 250.

Plaintiffs claim a three-fold violation under the substantive due process clause. They do not come close to establishing a substantive due process violation under any of them, however.

First, they all assert that their right to intimate associations under the First Amendment was violated and "[t]his includes the right to maintain dating relationships and even personal friendships." (Doc. No. 80 at 23). Plaintiffs are quick to note that the Supreme Court has recognized that "certain kinds of personal bonds," Roberts v. United States Jaycees, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), and "certain [kinds of] intimate conduct," Lawrence v. Texas, 539 U.S. 558, 562 (2003) are protected by the substantive component of the Due Process Clause, either as a part of the right to intimate association under the Fourteenth Amendment or the right to privacy under the First Amendment. What they do not do, however, is point to any controlling authority that would suggest intimate sexual activity between co-employees on work premises during work hours (as Medlin and Bohannon concede to have done) is protected by either the First Amendment or Fourteenth Amendment. Nor have they pointed to any authority to support a constitutional right to exchange sexual explicit images and messages during work hours utilizing the employers cellular service (as all three Plaintiffs have admitted doing).

Second, Medlin asserts that his fundamental right to free speech under the First Amendment was violated because "his communication and association with city council members was frowned upon and outright prohibited by his supervisor, Gary Harris, and the city administrator, Keith Morrison." (Id. at 25). As support, Medlin relies upon a Declaration from former Lieutenant Terry

18

Lindsay of the Algood Police Department who avers that (1) "Harris expressed on more than one occasion that he believed Justin Medlin had too much power and influence over the Algood City Council" and told him (Lindsay) that he "wanted to get rid of Justin because he had 'too much power,'"; and (2) Keith Morrison told him to "disseminate" that "police officers were not to consort with Algood city counsel members." (Doc. No. 78-7, Lindsay Decl. ¶¶ 13, 15). Medlin, himself, adds that he had "frequent communication with city council members – in particular Carolyn Norris," who he called "Mom," and that "he would communicate with her daily about city business and personal business, including city business related to upcoming meeting agendas." (PSOF ¶¶ 38, 63, 187).

"While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (citing Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)), a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." Rodgers v. Banks, 344 F.3d 587, 596 (6th Cir. 2003). This entails a three-step inquiry pursuant to what is called the Pickering/Connick balancing test.:

> First, a court must ascertain whether the relevant speech addressed a matter of public concern. See Connick v. Myers, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If the answer is yes, then the court must balance the interests of the public employee, "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Finally, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Perry, 209 F.3d at 604.

Id.  The burden falls on the employee "to demonstrate that the speech at issue represented a substantial or motivating factor in the adverse employment action," and must "point to specific, nonconclusory allegations reasonably linking h[is] speech to employer discipline.'" Id. (citing, Farmer v. Cleveland Pub. Power, 295 F.3d 593, 602 (6th Cir.1997); Johnson v. Univ. of Cincinnati, 215 F.3d 561, 584 (6th Cir. 2000)); accord, Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 400 (6th Cir. 2010)).

Assuming for the sake of argument that Medlin was actually constructively discharged, he wholly fails to carry his burden.  Not only is the Pickering/Connick balancing test not even mentioned let alone addressed in his supporting memorandum, he presents absolutely no evidence that this "speech" (or prohibited "consorting" to use Lindsay's term) was a substantial or motivating factor in his leaving the Algood police force.  Indeed, all of the evidence before the Court points to Medlin resigning in an effort to save some benefits because he had sexual relations while on duty and used a cell phone service provided by the City to send and receive lurid text and photographs.

Third, Larson and Bohannon point out they are single individuals who are allowed to date whom they choose and they did not engage in any criminal acts,"[y]et, despite their dedicated service, they were both unceremoniously fired without notice or much explanation" based solely on the contents of Medlin's cellphone.  (Id. at 26). They claim this, coupled with "the actions of Scott Bilbrey" and the "inaction of Keith Morrison, shocks the conscience." (Doc. No. 80 at 25).

As it is traditionally understood, conduct shocks the conscience if it "violates the 'decencies of civilized conduct, and includes actions "so brutal and offensive' so as to offend "fair play and decency." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846–47 (1998) (citations omitted).  "These are subjective standards, to be sure, but they make clear that the 'shocks the conscience' standard

is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation." Guerin v. State, 912 F.3d 907, 923 (6th Cir. 2019) (quoting Range v. Douglas, 763 F.3d 573, 589–90 (6th Cir. 2014)). "Stated differently, the shocks-the-conscience test is the way in which courts prevent transforming run-of-the-mill tort claims into violations of constitutional guarantees." Whether conduct shocks the conscience can be viewed on a continuum:

> The bookends present the easier cases. Merely negligent tortious conduct is categorically beneath constitutional due process, but conduct on the other extreme end of the culpability spectrum, that which is "intended to injure" without any justifiable government interest, most clearly rises to the "conscience-shocking" level. . . . Conduct that is more akin to recklessness or gross recklessness, such as deliberate indifference, is a "matter for closer calls.". . .

Range, 763 F.3d at 589.

Firing two employees who admittedly engaged in sexual activity in the workplace while on duty, and another who admittedly exchanged sexual explicit photos during work hours over a city provided service is not conscience-shocking. It is not even reckless, and may not even be negligent. The fact that the City could have investigated further, or held a pre-termination hearing for Larson and Bohannon does not make it any more so, particularly since "[t]he substantive due process [clause] is not concerned with whether procedures were followed, but rather "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." Glaspy v. Malicoat, 134 F. Supp. 2d 890, 894 (W.D. Mich. 2001) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).

### IV.  State Law Claims

In their supporting Memorandum, Defendants argue, "[a]s an initial matter" that "this Court should decline to exercise pendent jurisdiction over their state law claims," (Doc. No. 57 at 33), just

as it did in relation to Medlin's state law claims against Bilbrey when Medlin's federal claims as to that Defendant were dismissed.  Alternatively, Defendants request that this Court dismiss all of the Plaintiffs' state law claims.

In a Memorandum and Opinion issued in this case earlier this year, the Court observed that, pursuant to 28 U.S.C. § 1367(c)(3), there is a "strong presumption in favor of declining to exercise jurisdiction over supplemental state-law claims after dismissing federal anchor claims[.]'  Martinez v. City of Cleveland, 700 F. App'x 521, 523 (6th Cir. 2017)."  Medlin v. City of Algood, 355 F. Supp. 3d 707, 719 (M.D. Tenn. 2019).  While this ruling was made in the context of a motion for judgment on the pleadings, the same presumption can apply where, has here, the case has proceeded to the summary judgment phase.  See, e.g., Dorris v. Robertson Cty., No. 3:14-1202, 2016 WL 245512, at *7 (M.D. Tenn. Jan. 21, 2016);  Owen v. City of Lafayette, No. 2:10-00114, 2012 WL 589296, at *9 (M.D. Tenn. Feb. 21, 2012).  Nevertheless, a district should consider retaining jurisdiction where a case has proceeded through summary judgment because of the familiarization the court likely has with the file.  Gamel v. City of Cincinnati, 625 F.3d 949, 952 (6th Cir. 2010)

On some occasions, this Court has opted to retain jurisdiction over supplemental claims once the federal claims have been decided on summary judgment, see e.g., O'Connor v. Cunningham, No. 3:13-CV-00229, 2016 WL 3523884, at *4 (M.D. Tenn. June 28, 2016), but, in a majority of the others, it has declined to exercises that jurisdiction, see e.g., C.S. Sewell, M.D. P.C. v. Amerigroup Tennessee, Inc., No. 2:17-CV-00062, 2019 WL 1746519, at *2 (M.D. Tenn. Apr. 18, 2019); Shoap v. City of Crossville, 321 F. Supp. 3d 839, 850 (M.D. Tenn. 2018).  Ultimately, however, the decision is a matter of discretion, Harper v. Auto Alliance Int'l, Inc., 392 F.3d 195, 210 (6th Cir. 2004), and two factors, not present in most cases, weigh strongly in favor of declining to exercises

jurisdiction in this case.

First, Plaintiffs' state law claims are brought against a city and municipal officials and, as such, implicate Tennessee's Governmental Tort Liability Act ("GTLA"). That Act states that "[t]he Circuit courts shall have exclusive original jurisdiction over any action brought under this chapter and shall hear and decide such suits without the intervention of a jury, except as otherwise provided in § 29–20–313(b)." Tenn. Code Ann. § 29–20–307. The Sixth Circuit has held that the "unequivocal preference" of the Tennessee legislature that GTLA claims "be handled by its own state courts" is "an exceptional circumstance for declining jurisdiction." Gregory v. Shelby Cty., 220 F.3d 433, 446 (6th Cir. 2000), abrogated in part on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598 (2001)). This Court, of course, has followed suit and declined to exercise supplemental jurisdiction over GTLA claims once the federal claims were dismissed. See e.g., P.G. by & through R.G. v. Rutherford Cty. Bd. of Educ., 313 F. Supp. 3d 891, 906 (M.D. Tenn. 2018).

Second, this Court has already declined to exercise jurisdiction over Medlin's state law claims against Bilbrey, and he is free to refile those in the Putnam Circuit Court. Given this, it would make little sense to retain Medlin's state law claims against the other Defendants and have the parties potentially battle on two fronts, or, for that matter, retain the other Plaintiffs' state law claims against all of the Defendants, given that they all arise from a common set of facts and allege the same violations of state law.

### III. <u>Conclusion</u>

On the basis of the foregoing, Defendants' Motions for Summary Judgment (Case Nos. 2:17-cv-00079, Doc. No. 40; 2:17-cv-00080, Doc. No. 50; 2:18-cv-00022, Doc. No. 35) will be

granted with respect to Plaintiffs' federal claims.  The Court will decline to exercise supplemental

jurisdiction over Plaintiffs' state law claim and they will be dismissed without prejudice.

An appropriate Order will enter.

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE